IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

BRENDA PEPPERS,                          :
                                         :
                Plaintiff,               :
                                         :
v.                                       :      Civil Action No.
                                         :      2:09-CV-105-RWS-SSC
TRADITIONS GOLF CLUB,                    :
                                         :
                Defendant.               :

## ORDER and FINAL REPORT AND RECOMMENDATION

This case is before the court on Defendant's motion for summary judgment [Doc. 43] and Plaintiff's Motion for Leave to File Sur-Rebuttal Response to Defendant's Reply Brief in Support of its Motion for Summary Judgment [Doc. 51].

## I. Procedural History

Plaintiff Brenda Peppers ("Plaintiff") is an African-American woman who was formerly employed by Defendant Traditions Golf Club ("Defendant" or "Traditions").  (See Doc. 1, Compl.; Charge of Discrimination, Attach. to Doc. 1).  On June 15, 2009, Plaintiff filed a *pro se* complaint [Doc. 1] alleging that Defendant terminated her on the basis of her race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII").  Plaintiff is now represented by counsel.  (See Doc. 26).  Plaintiff did not state in her form Title VII complaint that she was also asserting a Title VII retaliation

1

claim.  (See Doc. 1).  However, on September 9, 2009, she filed a written statement [Doc. 10][1] in which she asserted, "I believe that I was discriminated against in retaliation for complaining about unlawful discrimination" in violation of Title VII, and she attached a copy of her most recent charge of discrimination filed with the U.S. Equal Employment Opportunity Commission ("EEOC") in which she alleged that she was terminated in retaliation for filing the previous charge.   The parties have proceeded on the assumption that Plaintiff has asserted both a discrimination and a retaliation claim.  (See, e.g., Doc. 18 at 1; Doc. 31 at 1).

Defendant filed an answer and amended answer [Docs. 11 & 13], and discovery proceeded.  Defendant has now filed a motion for summary judgment, with supporting memorandum, statement of undisputed material facts and exhibits [Doc. 43].   Plaintiff filed a response to Defendant's motion, with supporting memorandum and exhibits [Doc. 46], a statement of disputed material facts [Doc. 47] and a response to Defendant's statement of undisputed material facts [Doc. 48].  Defendant filed a reply brief [Doc. 49] and a response to Plaintiff's statement of disputed material facts [Doc. 50].

Plaintiff has also filed a Motion for Leave to File Sur-Rebuttal Response to Defendant's Reply Brief in Support of its Motion for Summary Judgment, which contains her sur-rebuttal response. [Doc. 51].

---

[1]Defendant has construed that filing as an amended complaint.  (See Doc. 13).

2

## II.  Plaintiff's Motion to File Sur-Rebuttal Response [Doc. 51]

Plaintiff moves for leave to file a response to Defendant's reply in order to address the issues (1) whether Kevin Kriews was involved in the decision to terminate Plaintiff's employment, as discussed *infra*, and (2) whether Timothy Dunlap merely acted as the "conduit for [Kriews'] discriminatory animus."  (See Doc. 51, at 2-5).  Defendant did not file a response to Plaintiff's motion, and the motion is therefore deemed to be unopposed.  See LR 7.1B. ("Failure to file a response shall indicate that there is no opposition to the motion.").  Accordingly, Plaintiff's motion for leave to file a sur-rebuttal response [Doc. 51] is **GRANTED**.

## III. Facts

### A.  Standards for Determining Facts for Summary Judgment

The "facts," for summary judgment purposes only, are derived from Defendant's Statement of Undisputed Material Facts to Which There Exists No Genuine Issue to be Tried [Doc. 43] (hereinafter "Def. SMF"), Plaintiff's response to Defendant's statement [Doc. 48]; Plaintiff's Statement of Material Facts of Which There Exist Genuine Issues to be Tried [Doc. 47] (hereinafter "Pl. SMF"); Defendant's response to Plaintiff's statement [Doc. 50]; and uncontroverted record evidence.

The undersigned notes that in response to Def. SMF ¶¶ 22, 23, 29, 42, 62, 73 and 74 Plaintiff "[d]ispute[s]" or "[d]ispute[s] as alleged" Defendant's statements because she is "without knowledge" or "is not aware" of the events described in those statements.  These responses are insufficient to create an issue of fact with

respect to those statements, and the statements are deemed admitted.  See LR 56.1B.(2)a.(4), NDGa. ("The response that a party has insufficient knowledge to admit or deny is not an acceptable response unless the party has complied with the provisions of Fed.R.Civ.P. 56(f).").  Plaintiff has not complied with the provisions of Fed. R. Civ. P. 56(f), which provides that "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition," the court may, among other things, deny the motion for summary judgment or allow additional discovery.

Furthermore, Plaintiff's statement of disputed material facts [Doc. 47] fails to comply with LR 56.1B.(2)b., which requires the respondent to file "[a] statement of additional facts which the respondent contends are material and present a genuine issue for trial," and provides that the statement "must meet the requirements set out in LR 56.1B.(1)."  LR 56.1B.(1) requires that "[e]ach material fact must be numbered separately and supported by a citation to evidence proving such fact."  In contravention of that requirement, Plaintiff's statement is made up of three long paragraphs, each containing several unnumbered assertions, most of which (1) are not supported by a citation to record evidence or (2) cite to materials that do not support Plaintiff's allegations.  The court will not sift through the record to find support for Plaintiff's statements; nor will the court consider any statement by the parties that is not supported by citation to the record.

The court has reviewed the record, including the parties' filings, to

determine whether genuine issues of material fact exist to be tried.  However, the court is not obligated to "scour the record" to make that determination.  <u>Tomasini v. Mt. Sinai Med. Ctr. of Fla.</u>, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004). The facts are construed in the light most favorable to Plaintiff as the non-movant. <u>See</u> <u>Frederick v. Sprint/United Mgmt. Co.</u>, 246 F.3d 1305, 1309 (11th Cir. 2001).

## B.  **The Facts Relevant to Defendant's Motion for Summary Judgment**[2]

### 1.  **The Parties**

Sequoia Golf Braselton, LLC d/b/a Traditions of Braselton Golf Club is a private golf facility located in Jefferson, Georgia.  (Def. SMF, ¶ 1).  Traditions is one of over twenty golf facilities in Georgia that are owned and operated by Sequoia Golf Holdings, LLC under the name Canongate Golf Clubs.  (Def. SMF, ¶ 2).

Plaintiff is a former employee of Traditions, where she worked from April 2008 until November 2008, and again from March 2009 until June 2009.  (Def. SMF, ¶ 4).  During both periods of her employment with Defendant, Plaintiff worked as a server, and in that capacity she waited tables and served drinks at the club's bar and grill.  (Def. SMF, ¶ 5).

### 2.  **Defendant's Policy Against Discrimination**

At the inception of her employment with Traditions, Plaintiff received a copy of Defendant's Employee Handbook.  (Def. SMF, ¶ 6).  The Handbook contains

---

[2] Certain other facts relevant to the undersigned's consideration of the motion are discussed in the body of this Report.

Defendant's Equal Employment Opportunity policy, which provides that Defendant does not discriminate in employment opportunities on the basis of race, color, sex, disability, or any other characteristic protected by law. (Def. SMF, ¶ 7). The EEO policy further provides that any employee who feels he or she has been subjected to discrimination should report the matter to a member of management and that such reports may be made by employees without fear of reprisal. (Def. SMF, ¶ 8).

### 3.  __Defendant's November 2008 Layoffs__

Business is substantially slower at Traditions in Braselton (and in the golf industry generally) during the winter months, and as a result, resource demands vary greatly at Traditions by season. (Def. SMF, ¶ 9). Traditions has greater staffing needs during the high-demand spring and summer months, and fewer resource demands and staffing needs during the slower fall and winter months. (Def. SMF, ¶ 10; Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶ 5).[3]

On October 23, 2008, Kevin Kriews, General Manager of Traditions, issued a memo to all staff stating that the club would be laying off part of its staff in the coming months. (Def. SMF, ¶ 11). The memo stated in relevant part:

> As we move into November and the winter months, our hours of operation will get shorter and our business will slow down. This

---

[3] Plaintiff "[d]ispute[s]" Def. SMF ¶ 10 and asserts, "Defendant hired new staff, *to wit*: Angela Miller during the winter months." (Pl. Resp. to Def SMF, ¶ 10). She cites Defendant's brief at page 11 and her own affidavit at paragraph 13 as support. But Plaintiff's affidavit does not dispute the seasonal nature of Defendant's business, and it cannot seriously be disputed that golf is a seasonal outdoor activity and that its popularity ebbs during the colder winter months. Defendant's hiring of Miller is discussed *infra*.

means that we have to adjust our schedules and unfortunately reduce our work force for the season.  Please be advised that your supervisor will be letting you know if this impacts you and if there are any other opportunities for hours in another department.

(Def. Ex. 4 to Peppers Dep.).  Plaintiff saw the October 23rd memo posted on the bulletin board at Traditions. (Def. SMF, ¶ 12).  In early November 2008, Plaintiff and another server, Erica Campbell, a Caucasian woman, were laid off as part of this seasonal layoff.  (Def. SMF, ¶¶ 13, 14, 21).[4]  At or about the time Plaintiff was laid off, Head Server Crystal Wood and General Manager Kriews told Plaintiff she was eligible for rehire.  (Def. SMF, ¶ 15).

At the time of the November 2008 layoff, three other employees worked primarily as servers at Traditions in Braselton in addition to Plaintiff: Campbell, Wood and Tara Spicer.  (Def. SMF, ¶ 16).  Wood was the Head Server at Traditions and supervised the other servers.  (Def. SMF, ¶ 17).  In addition to functioning as a server, Spicer also was a chef in the facility's bar and grill.  (Def. SMF, ¶ 18).  According to Defendant, Wood was retained in light of her supervisory position as Head Server, and Spicer was retained because she was able to function as a cook as well as a server.  (Def. SMF, ¶¶ 19, 20; Mead Decl., Def. Ex. 5 to Doc. 43, ¶ 4; Spicer Decl., Def. Ex. 3 to Doc. 43, ¶ 6).  Plaintiff disputes that contention.  (Pl. Resp. to Def. SMF, ¶¶ 19, 20).[5]

---

[4] Plaintiff's Department of Labor Separation Notice indicated the reason for separation was "Lack of Work."  (Def. Ex. 5 to Peppers Dep.).

[5] In response to Def. SMF ¶¶ 19 and 20, Plaintiff writes "[d]isputed" and makes several assertions, apparently in an effort to controvert Defendant's claimed reliance on Wood's supervisory status and Spicer's dual roles as a cook and server in support of its decision not to lay

Shortly after the November layoffs, in early December 2008, Wood resigned her employment for personal reasons.  (Def. SMF, ¶ 22).  Wood was not replaced; rather, Spicer was reclassified as Head Server, and she functioned at that time as the sole regular server at Traditions during the winter months.  (Def. SMF, ¶ 23).

### 4.    **Plaintiff's December 2008 EEOC Charge**

On December 17, 2008, Plaintiff filed an EEOC charge of discrimination alleging that she was laid off in November because of her race in violation of Title VII.  (Def. SMF, ¶ 24; Def. Ex. 6 to Peppers Dep.).  Plaintiff alleged that she was not given the opportunity to work part time in the same manner as white servers with less seniority.  (Def. SMF, ¶ 25).

Plaintiff testified that those  white employees  were "Tanya" (last name unknown) and "Angela" (last name unknown), who were part-time "on the schedule" when she and Campbell were laid off.  (Def. SMF, ¶ 26).  Plaintiff testified that "Tanya" worked with her as "a cart girl for awhile" and "at Hamilton Mill for awhile."  (Def. SMF, ¶ 27).  Plaintiff further testified that she believed "Angela" quit her job "[r]ight after" Plaintiff was laid off, based on what someone (whom Plaintiff could not identify) told her over the phone.  (Def. SMF, ¶ 28; Peppers Dep. at 32).

Angela Miller was employed briefly as a server part-time at Traditions in the fall of 2008; she worked a total of 43 hours, but left her employment in early

---

off Wood and Spicer.  Plaintiff's assertions are discussed *infra* in the analysis of whether Defendant's articulated legitimate, non-discriminatory reasons for laying off Plaintiff were pretextual.

November.  (Def. SMF, ¶ 29; Spicer Decl., Def. Ex. 3 to Doc. 43, ¶ 5).[6]  Tanya West

worked as a beverage-cart attendant at Traditions, not as a server, around the

time of the November 2008 layoffs, and in that capacity she took a beverage cart

around the golf course to deliver drinks and snacks to golfers.  (Def. SMF, ¶ 30).

According to Plaintiff, she (Plaintiff) worked a full-time schedule with

corresponding benefits prior to the November 2008 layoff.  (Def. SMF, ¶ 31).

### 5.    Rehiring of Plaintiff and Campbell in March 2009

At the start of the spring season at Traditions, in March 2009,

approximately three months after Plaintiff had filed her December 2008 EEOC

charge (and while that charge was still pending), Food & Beverage Director Jason

Amland called Plaintiff and asked if she would like to come back to work.  (Def.

SMF, ¶ 32; Pl. Resp. to Def. SMF, ¶ 32).  Amland was not employed at Traditions

when Plaintiff worked there previously in 2008.  (Def. SMF, ¶ 37).  Plaintiff

accepted the offer of re-employment and returned to work at Traditions on or by

March 10, 2009.  (Def. SMF, ¶ 33).  Traditions also rehired Campbell, who, like

Plaintiff, had been laid off in November 2008 as part of Defendant's seasonal

layoff.  (Def. SMF, ¶ 34).  When Plaintiff returned to work in March 2009, she

reported directly to Amland and Spicer, Head Server, and she also reported to

Kriews, General Manager.  (Def. SMF, ¶ 35; Pl. Resp. to Def. SMF, ¶ 35).  In her

capacity as Head Server, Spicer set the schedules for herself and the other servers,

---

[6] Plaintiff testified that "Angela" called her and told her that she (Angela) was fired (Peppers Dep. at 28), while Spicer testified that Angela left for another job (Spicer Decl., Def. Ex. 3 to Doc. 43, ¶ 5).  That dispute is immaterial.

and they were approved for posting by Amland.  (Def. SMF, ¶ 36).

### 6.   Plaintiff's Performance Following Her Return to Traditions

On April 1, 2009, Spicer completed a Disciplinary Report for "Lack of Cooperation/Teamwork" and "Improper Conduct" concerning an incident when Plaintiff raised her voice and was insubordinate to Spicer.  (Def. SMF, ¶ 40; Def. Ex. 10 to Peppers Dep.).  In her Report, Spicer wrote that she saw Plaintiff cutting up lemons on a plate and told Plaintiff to use a cutting board, but Plaintiff "refused to get one and stated that she could not find one."  (Def. Ex. 10 to Peppers Dep.).  Spicer also wrote that she instructed Plaintiff how to cut the lemons properly, and Plaintiff responded, "[W]ell then you should do it yourself[.]" (Id.).  Spicer further wrote that later in the day Plaintiff "raise[d] her voice to me in an insubordinate manner in front of customers." (Id.).  Plaintiff's deposition testimony about the incident was that she "was cutting up some lemons or something, and [Spicer] yelled at [her], and [Plaintiff] said, If you're going to be yelling at me, you do it yourself." (Peppers Dep. at 63).  Spicer was not aware at any time during Plaintiff's employment that Plaintiff had filed a charge of discrimination against Traditions.  (Def. SMF, ¶ 42).

On April 10, 2009, Plaintiff received a Written Warning from Food & Beverage Director Amland for serving wine without charging the proper amount for it.  (Def. SMF, ¶¶ 43, 44; Def. Ex. 11 to Peppers Dep.).  Plaintiff testified at her deposition that it was only a small amount of wine, and she did not know how much to charge for it.  (Def. SMF, ¶ 45).

On or about April 30, 2009, Plaintiff received a Record of Verbal Counseling notice from General Manager Kriews. (Def. SMF, ¶ 47; Def. Ex. 12 to Peppers Dep.). The notice indicated that a club member had complained of poor service from Plaintiff. (Def. SMF, ¶ 48). Plaintiff does not know whether or not the member complained that she provided poor service, but she did receive and sign the April 30th notice. (Def. SMF, ¶ 49).

Plaintiff was also issued the April 30th Record of Verbal Counseling notice for yelling while at work. (Def. SMF, ¶ 50). Spicer testified that a member complained to her that Peppers was "screaming while standing in the outside patio area of the bar and grill, which is next to a putting green," and the member "also complained to [Spicer] generally of poor service by [Plaintiff]." (Spicer Decl., Def. Ex. 3 to Doc. 43, ¶ 12). Plaintiff admits that she "was on [her] phone with [her] son," and her "voice kind of carried," but she contends that the incident was "blow[n] . . . out of proportion in [her] book" because she "wasn't that loud," and she denies that she was yelling. (Peppers Dep. at 73). She does not "have any reason to dispute that a member complained" about her being loud, however. (Id.). Plaintiff apologized to Kriews for talking on the phone with her son. (Id. at 72).

On or about May 13, 2009, Plaintiff received a Disciplinary Report from Spicer relating to a dispute between the two of them during a golf tournament set-up. (Def. SMF, ¶ 57; Def. Ex. 13 to Peppers Dep.). The May 13th Disciplinary Report denotes insubordination and improper conduct by Plaintiff. (Def. SMF,

11

¶ 58).  The incident underlying the Report was a dispute between Plaintiff and Spicer about the type of dishes and silverware to use, during which Plaintiff told Spicer, "I can clock out and go home.  We are not getting anywhere."  (Peppers Dep. at 79-80).  Spicer then reported the incident to Matthew Mead, Operations Manager and Tournament Sales Director at Traditions (Peppers Dep. at 80; Mead Decl., Def. Ex. 5 to Doc. 43, ¶¶ 2, 6), and according to Plaintiff, "[Mead] said I could go home, and I said, Okay, then.  That's what I suggested the first time." (Peppers Dep. at 80).  When asked whether she "decided to leave that day, or [was] sent home," Plaintiff responded, "I was sent home."  (Id.).

On May 15, 2009, Plaintiff received a Written Warning [7] from Amland for not reporting to work on time for her scheduled shift; Amland wrote on the warning, "I informed her that . . . she can only call out for a shift to me."  (Def. SMF, ¶ 63; Def. Ex. 14 to Peppers Dep.).  Plaintiff testified that she had arranged to have her shift covered that day by server Katie Merrell until she could get to work.  (Def. SMF, ¶ 64).

On June 12, 2009, Plaintiff's employment at Traditions was terminated. (Def. SMF, ¶ 68).  Plaintiff's Termination Notice, signed by Kriews, denotes termination due to "[c]ustomer complaints regarding poor service" and "[l]ack of teamwork with rest of the staff."  (Def. SMF, ¶ 69; Def. Ex. 15 to Peppers Dep.).[8]

---

[7] The form indicates that it was a "3rd warning."  (Def. Ex. 14 to Peppers Dep.)

[8] The Department of Labor Separation Notice indicates that Plaintiff was terminated for "[C]ustomer complaints regarding poor service.  Lack of team work with rest of the staff."  (Def. Ex. 16 to Peppers Dep.).

Kriews explained to Plaintiff, when he informed her of her termination, that "a golf member was complaining about [her], that [she] had poor service," and Plaintiff responded, "Okay, but Kev[i]n I had 20 to 25 golfers to feed by myself.  I had to serve the alcohol, food, beverage, and the drinks, and I had no help, and they offered me no help." (Peppers Dep. at 95-96).[9]  Plaintiff testified that the customer who complained about her had said to her, "Ma'am, I am so sorry.  You are in here by yourself.  You need some help . . . . It's not your fault," and he gave her $5.00. (Id. at 95-96).  Amland testified that it is common for a single server to be on duty at a given time at Traditions, particularly during lunch.  (Def. SMF, ¶ 71; Amland Decl., Def. Ex. 6 to Doc. 43, ¶ 8).[10]

Meanwhile, following the customer complaint that led to Plaintiff's June 12, 2009 termination, Kriews had telephoned Tim Dunlap, the Regional Director at Sequoia Golf Holdings, LLC.  (Def. SMF, ¶ 73).  Dunlap testified that "Kriews described to me that Traditions had received multiple complaints from members regarding Ms. Peppers' conduct and/or customer service in recent months," and "further relayed that Ms. Peppers had exhibited on repeated occasions a lack of cooperation and teamwork with other staff members, including Head Server Tara

---

[9] During her deposition, Plaintiff first testified that this incident occurred during a tournament but then clarified, "it wasn't [a] tournament set up . . .  it was more of a privately -- a couple of members getting together and playing a golf game, which it ended up being like 20, 25 of them." (Peppers Dep. at 95-97).

[10] Plaintiff disputes Def. SMF ¶ 71 and asserts, "It is not common for a Server to be responsible for serving 20 to 25 guests singularly."  (Pl. Resp. to Def. SMF, ¶ 71).  She cites no record evidence in support of that assertion.  In her deposition, she testified that she "did lunch by [herself]."  (Peppers Dep. at 92).  She has not controverted Def. SMF ¶ 71.

Spicer." (Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶ 8). Based on his discussion with Kriews, and his consideration of Plaintiff's recurring performance problems, Dunlap determined that Plaintiff's performance had reached an unacceptable level, and he elected to terminate Plaintiff's employment due to customer complaints and her problems working with other staff members. (Def. SMF, ¶ 75; Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶ 9).[11]

### 7.    Plaintiff's Lawsuit and Second EEOC Charge

The EEOC issued a Dismissal and Notice of [Suit] Rights concerning Plaintiff's December 2008 charge on March 13, 2009.   (Def. Ex. 8 to Peppers Dep.). Plaintiff filed this civil action on June 15, 2009 [Doc. 3], three days after she was terminated. (Def. SMF, ¶ 78).

On August 26, 2009, Plaintiff filed a second EEOC charge, alleging that she had been terminated in retaliation for complaining of unlawful discrimination in violation of Title VII. (Def. SMF, ¶ 82; Def. Ex. 20 to Peppers Dep.). The EEOC issued a Notice of Right to Sue on September 2, 2009. (Def. Ex. 22 to Peppers Dep.).

### IV.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[11] Citing her Termination Notice (Pl. Ex. 12 to Doc. 46), which reflects that it was signed by Kriews, Plaintiff disputes Def. SMF ¶ 75. However, the fact that Kriews, and not Dunlap, signed the Termination Notice does not controvert Dunlap's sworn declaration that he decided to terminate Plaintiff. In any case, both Kriews and Dunlap were aware of Plaintiff's December 2008 EEOC charge prior to her termination. (See Def. Ex. 4 to Doc. 43, Def. Resp. to Interrog. 23).

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  See id. at 322, 324.  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  Id. at 249, 255.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Id. at 255.

The Eleventh Circuit has explained summary judgment as follows:

The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against

15

> a party who fails to make a showing sufficient to establish the
> existence of an element essential to the party's case, and on which
> that party will bear the burden of proof at trial.  In such a situation,
> there can be "no genuine issue as to any material fact," since a
> complete failure of proof concerning an essential element of the non-
> moving party's case necessarily renders all other facts immaterial.

Young v. General Foods Corp., 840 F.2d 825, 828 (11th Cir. 1988) (quoting

Celotex Corp. 477 U.S. at 322-23), cert. denied, 488 U.S. 1004 (1989).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment

supported by affidavits[,] cannot meet the burden of coming forth with relevant

competent evidence by simply relying on legal conclusions or evidence which

would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.

1991), cert. denied, 506 U.S. 952 (1992).   The evidence "cannot consist of

conclusory allegations or legal conclusions."   Id.   Unsupported self-serving

statements by the party opposing summary judgment are insufficient to avoid

summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d

705, 714 (11th Cir. 1984).

## V.  Discussion

### A.    Title VII Race Discrimination Claim

Plaintiff alleges that she was laid off in November 2008 because of her race

in violation of Title VII.  (See Doc. 46, Pl. Br. at 7).[12]  Title VII provides, "It shall be

---

[12] In its motion for summary judgment, Defendant argues that Plaintiff cannot make out
a *prima facie* case of discrimination based on race with respect to her November 2008 layoff, her
disciplinary write-ups, her June 2009 termination or "several other slights or grievances she claims
to have suffered during her employment."  (See Doc. 43, Def. Br. at 4-9, 12-16).  In response to

an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).

### 1.    **Analytical Framework for Disparate Treatment Claims**

A Title VII plaintiff may establish a *prima facie* case of discrimination through circumstantial evidence under the framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248 (1981):[13]

> [A] plaintiff establishes a prima facie case of race discrimination under Title VII by showing: (1) [s]he belongs to a racial minority; (2) [s]he was subjected to adverse job action; (3) h[er] employer treated

---

Defendant's motion, the only action Plaintiff alleges to have been racially discriminatory is the November 2008 layoff. (<u>See</u> Doc. 46, Pl. Br. at 7-13). Plaintiff addresses her disciplinary write-ups and June 2009 termination as part of her retaliation claim. (<u>See</u> <u>id.</u> at 18-22). Therefore, to the extent that Plaintiff alleged in her complaint [Doc. 1] or her September 9, 2009 filing [Doc. 10] that employment actions other than her November 2008 layoff were racially discriminatory, she has abandoned those claims by failing to address them in her brief. It is therefore **RECOMMENDED** that summary judgment be **GRANTED** to Defendant on all race discrimination claims, other than Plaintiff's discriminatory layoff claim, as all such claims have been abandoned. See <u>Fedorov v. Bd. of Regents</u>, 194 F. Supp. 2d 1378, 1393 (S.D. Ga. 2002) ("Grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (quoting <u>Resolution Trust Corp. v. Dunmar Corp.</u>, 43 F.3d 587, 599 (11th Cir.)(en banc), <u>cert. denied</u>, 516 U.S. 817 (1995))); <u>accord Snyder v. Time Warner, Inc.</u>, 179 F. Supp. 2d 1374, 1385 (N.D. Ga. 2001); <u>Welch v. Delta Air Lines, Inc.</u>, 978 F. Supp. 1133, 1140 (N.D. Ga. 1997).

[13] The method of proving unlawful discrimination using the burden-shifting scheme discussed below is frequently referred to as the <u>McDonnell Douglas</u> or <u>McDonnell Douglas/Burdine</u> framework or burden-shifting analysis. <u>See, e.g.</u>, <u>Thomas v. Tenneco Packaging Co.</u>, 293 F.3d 1306, 1315 (11th Cir. 2002); <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501, 510 (11th Cir. 2000).

similarly situated employees outside h[er] classification more favorably; and (4) [s]he was qualified to do the job.

Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); accord Jones v. Bessemer

Carraway Med. Ctr., 137 F.3d 1306, 1310-11 (11th Cir.), modified, 151 F.3d 1321

(11th Cir. 1998).

If a plaintiff presents a *prima facie* case through circumstantial evidence, "the defendant must 'articulate some legitimate, nondiscriminatory reason for the [adverse employment action].' " Bessemer, 137 F.3d at 1310 (quoting McDonnell Douglas, 411 U.S. at 802). If the defendant satisfies this rebuttal burden by producing evidence of a legitimate rationale for its decision, "the plaintiff may attempt to show that the proffered reason was merely a pretext for the defendant's acts." Bessemer, 137 F.3d at 1310 (citing Burdine, 450 U.S. at 253). In Burdine, the Court explained the next step, once the defendant employer articulates a legitimate, non-discriminatory reason for the employment decision:

> [The plaintiff] now  must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.  She may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Burdine, 450 U.S. at 256. The Supreme Court explained further in St. Mary's

Honor Ctr. v. Hicks, 509 U.S. 502, 508-09, 511 (1993), that the jury's disbelief of

the employer's proffered explanation does not mandate a finding of intentional

discrimination but rather permits the jury to make that finding. The Court elaborated:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination[.]

Id. at 511 (footnote omitted)(emphasis in original); accord Hall v. Ala. Ass'n of School Bds., 326 F.3d 1157, 1167 (11th Cir. 2003)("[T]he mere disbelief of the employer's proffered reason does not 'compel' a finding of discrimination.").

In this case, Plaintiff does not assert that she has presented direct evidence of race discrimination;[14] rather, she contends that she has established a *prima facie* case of discrimination under the McDonnell Douglas framework. (See Doc. 46, Pl. Br. at 7). Therefore, the undersigned analyzes Plaintiff's claim under the McDonnell Douglas/Burdine burden shifting framework for proving a circumstantial case of discrimination.

### 2.   **Plaintiff's *Prima Facie* Case**

In a reduction-in-force case, courts have generally used the following formulation of a *prima facie* case of discrimination:

> "(1) that [the plaintiff] was in a protected class and was adversely affected by an employment decision, (2) that he was qualified for his

---

[14] Plaintiff has never heard anyone at Traditions make any comments about her race. (Def. SMF, ¶ 98).

> current position or to assume another position at the time of
> discharge, and (3) evidence by which a fact finder could reasonably
> conclude that the employer intended to discriminate in reaching that
> decision."

Padilla v. N. Broward Hosp. Dist., 270 F. App'x 966, 971 (11th Cir. 2008)

(unpublished decision) (quoting Smith v. J. Smith Lanier & Co., 352 F.3d 1342,

1344 (11th Cir. 2003)).  However, both parties have relied on the formulation set

forth in Maynard v. Board of Regents, 342 F.3d 1281 (11th Cir. 2003).  (See Doc.

43, Def. Br. at 5; Doc. 46, Pl. Br. at 7).  That formulation is as follows:

> To prevail on a claim for discrimination under Title VII based on
> circumstantial evidence, [Plaintiff] must show that: (1) [s]he is a
> member of a protected class; (2) [s]he was qualified for the position;
> (3) [s]he suffered an adverse employment action; and (4) [s]he was
> replaced by a person outside h[er] protected class or was treated less
> favorably than a similarly-situated individual outside h[er] protected
> class.

342 F.3d at 1289.  Defendant argues that "Plaintiff cannot establish a *prima facie*

case of discrimination based on her November 2008 layoff, because she has

identified no similarly situated individuals who were treated more favorably than

she was." (Doc. 43, Def. Br. at 6).  Plaintiff responds that "Crystal Wood and Tara

Spicer were similarly situated to Plaintiff, outside Plaintiff's race and were retained

as Servers." (Doc. 46, Pl. Br. at 9).

The undersigned will assume for purposes of resolving Defendant's motion

for summary judgment that Plaintiff can make out a prima facie case, regardless

of which formulation is used.  The focus of the analysis will be on Defendant's

articulated legitimate, non-discriminatory reasons for laying off Plaintiff in November 2008, while retaining Wood and Spicer, and whether there is evidence that these reasons were a pretext for unlawful discrimination.

### 3.   <u>Legitimate, Non-Discriminatory Reason for Employment Decision</u>

The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion. <u>Standard v. A.B.E.L Servs.</u>, 161 F.3d 1318, 1331 (11th Cir. 1999). This burden is "exceedingly light." <u>Turnes v. Amsouth Bank, N.A.</u>, 36 F.3d 1057, 1060-61 (11th Cir. 1994)(internal quotation omitted). Defendant asserts that it laid off Plaintiff and Erica Campbell, a Caucasian server, in November 2008 as part of its seasonal layoff during the winter months, when business is slower at Traditions, and resource demands are reduced. (Doc. 43, Def. Br. at 9-10; <u>see also</u> Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶¶ 5, 6; Def. Ex. 4 to Peppers Dep.). Defendant also asserts that Crystal Wood was not selected for layoff because she was a supervisor, i.e., Head Server, and Tara Spicer was retained because she was able to work as both cook and server. (Doc. 43, Def. Br. at 10; <u>see also</u> Mead Decl., Def. Ex. 5 to Doc. 43, ¶ 4; Spicer Decl., Def. Ex. 3 to Doc. 43, ¶ 6). The undersigned finds that Defendant has met its "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for selecting Plaintiff, along with Campbell, to be laid off and for retaining Wood and Spicer.

### 4.   <u>Pretext</u>

21

Because Defendant has articulated such a reason, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision" in order to survive summary judgment.  Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000)(en banc)(quoting Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).  " 'To avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.' " Brooks v. Cnty. Comm'n, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1995)).

The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (internal quotation omitted).  "[E]vidence sufficient to discredit a defendant's proffered nondiscriminatory reasons for its actions, taken together with the plaintiff's prima facie case, is sufficient to support (but not require) a finding of discrimination." Id. at 1535. "A reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the

real reason.' " <u>Brooks</u>, 446 F.3d at 1163 (quoting <u>Hicks</u>, 509 U.S. at 515).

Plaintiff first argues that Defendant's reasons for selecting her for layoff are pretextual because Defendant hired Angela Miller "in October 2009 [sic], one month before a scheduled seasonal reduction in staff." (Doc. 46, Pl. Br. at 13). However, as discussed *supra*, Plaintiff has not controverted the fact that Miller was hired as a part-time employee in the fall of 2008 and her employment ended in early November 2008, and Plaintiff has not shown that Miller was retained during the layoff while Plaintiff was let go. The undersigned finds that the hiring of Miller as a part-time server does not demonstrate that Defendant's articulated rationale for laying off Plaintiff, who was a full-time employee with benefits, is pretextual.

Plaintiff also appears to question the fairness and wisdom of Defendant's decision to select her for the layoff rather than another employee. She asserts, "Plaintiff was an experienced worker, who performed two important functions at the golf club, food and beverage service, while demonstrating competent knowledge of Defendant's business." (Doc. 46, Pl. Br. at 13). She also points to factors such as relative seniority, job knowledge and pay rate that she apparently believes Defendant should have used as the bases for its layoff decisions. (<u>Id.</u>). Plaintiff asserts that she was the "most tenured"; she "was the only employee to meet the testing requirements"; and Spicer was paid more than Plaintiff. (<u>Id.</u>). Plaintiff does not cite to record support for her assertions that she was "most

tenured"[15] or that she "was the only employee to meet the testing requirements."[16]

Plaintiff's effort to show that there is a jury question on pretext fails. In the first place, Plaintiff cannot show that Defendant's reasons for its decisions were pretextual by arguing that the decisions were unwise or unfair. The Eleventh Circuit explained in Chapman:

> A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.

229 F.3d at 1030; see also Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Title VII addresses *discrimination*. Title VII is not a shield against harsh treatment at the workplace. Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason. While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal

---

[15] The undersigned notes Plaintiff's affidavit testimony that she "was the most senior of all the servers." (Peppers Aff., Attach. 4 to Doc. 46, ¶ 4). Even if that statement is true, Plaintiff's "seniority" was not significant, given that when she was laid off in November 2008, she had only worked for Traditions since April 2008.

[16] The undersigned also notes Plaintiff's affidavit testimony that she received the highest score on a wait staff test in the summer of 2008 and that "[t]he other Servers told [her] that they each failed the test." (Peppers Aff., Attach. 4 to Doc. 46, ¶¶ 7, 8). Presumably that is the "testing requirement" to which she refers.

discrimination.  The employer's stated legitimate reason . . . does not have to be a reason that the judge or jurors would act on or approve." (internal quotations omitted) (emphasis in original)); <u>Smith v. Sunbelt Rentals, Inc.</u>, 356 F. App'x 272, 278-79 (11th Cir. 2009) (unpublished decision) ("We do 'not sit as a super-personnel department that reexamines an entity's business decisions,' but the 'inquiry is limited to whether the employer gave an honest explanation of its behavior.' " (quoting <u>Chapman</u>, 229 F. 3d at 1030)).

Furthermore, even if Plaintiff's assertions are true, Defendant has not identified seniority, job knowledge or pay rate as factors it considered when making the layoff decisions, and Plaintiff has failed to rebut the reasons Defendant has articulated for those decisions.  She has not shown that Defendant, a golf club, does not experience a seasonal downturn in business during the winter months, with a resulting reduction in business hours and need for staff. In fact, as noted, she was not the only server laid off; Defendant also laid off Campbell, a Caucasian server.  Nor has Plaintiff controverted Defendant's reasons for retaining Wood and Spicer instead of Plaintiff and Campbell.  Wood was a supervisor, a reason Plaintiff has failed to address at all.  While Plaintiff has attempted to minimize the difference between her and Wood by asserting that Wood "served food and beverages just as Plaintiff, and performed additional scheduling duties" (Doc. 46, Pl. Br. at 9-10), it is uncontroverted that Wood was Plaintiff's immediate supervisor (Peppers Dep. at 41), a fact Plaintiff ignores.

With respect to Spicer, Plaintiff argues that "[t]he only difference[] between Spicer and Plaintiff . . . is that, Plaintiff had more seniority and demonstrated a higher level of competence in Defendant[']s business than Spicer." (Doc. 46, Pl. Br. at 10). Plaintiff also asserts that she, like Spicer, "assumed additional roles as needed" (Id. at 13). The "additional responsibilities" assumed by Plaintiff apparently included bartending (see id. at 10, 13), although Plaintiff cites no evidence to support that fact. But regardless of whether Plaintiff had "additional responsibilities" as a bartender, Plaintiff has failed to show that she, like Spicer, also worked as a cook. As for Plaintiff's assertion that she "demonstrated a higher level of competence" than Spicer, it is both conclusory and unsupported by record citation; it is not evidence of pretext.

"In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman, 229 F.3d at 1037. Plaintiff has failed to meet Defendant's reasons "head on and rebut" them, she has failed to demonstrate that there is a jury question on pretext, and she therefore cannot avoid summary judgment. Because Plaintiff has not presented evidence from which a reasonable jury could find that Defendant's reasons for including Plaintiff in the November 2008 layoffs are a pretext for prohibited discrimination, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's Title VII race discrimination claim.

**B.**   **Title VII Retaliation Claim**

In her September 9, 2009 filing [Doc. 10], Plaintiff alleged that she was retaliated against for filing her charge of discrimination in December 2008.

**1.**   **Analytical Framework for Retaliation Claims**

Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."   The participation clause of the statute, at issue in this case, "protects  proceedings and activities which occur in conjunction with or after the  filing of a formal  charge  with  the  EEOC[.]" EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000); see also Booker v. Brown & Williamson Tobacco Co., 879 F.2d 1304, 1313 (6th Cir. 1989) (instigation of statutory proceedings is prerequisite to protection under participation clause).

To establish a *prima facie* case of retaliation under Title VII, in the absence of direct evidence, the plaintiff must show that "(1) [she] engaged in a statutorily protected activity; (2) the employer took an adverse employment action against [her][17]; and (3) there is a causal connection between the protected activity and the

---

[17] In Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006), the Supreme Court addressed the adverse action component of a retaliation claim.  The Court explained that in order to establish a claim under Title VII's anti-retaliation provision, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this

adverse action." Berman v. Orkin Exterminating Co., 160 F.3d 697, 701 (11th Cir. 1998). The causal connection prong is satisfied by evidence that the protected action and the adverse employment action are not totally unrelated. Id.

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant does so, then in order to avoid summary judgment, the plaintiff must point to evidence from which reasonable jurors could conclude that the employer's proffered explanations are a pretext for retaliation. See id.[18] The ultimate burden of proving pretext remains on the plaintiff. Id.

### 2.   Plaintiff's *Prima Facie* Case

It is undisputed that Plaintiff engaged in statutorily protected activity when she filed an EEOC charge in December 2008 following her November 2008 layoff. She also suffered an adverse employment action when she was terminated on June 12, 2009.[19] Furthermore, it is undisputed that Kriews and Dunlap, the

---

context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

[18]   Retaliation claims under Title VII are also analyzed under the McDonnell Douglas/Burdine burden-shifting framework used to prove disparate treatment cases by circumstantial evidence. See Johnson, 234 F.3d at 511 n.10.

[19]   In her discussion of her *prima facie* case of retaliation (see Doc. 46, Pl. Br. at 14-18), the only adverse employment action Plaintiff identifies is her termination on June 12, 2009 (id. at 18); she also makes passing reference to her first write-up in April 2009 (id. at 16). She then asserts that "Defendant'[s] proffered reasons for terminating Plaintiff's employment are merely pretext for discrimination" (id. at 18) in the section of her brief where she discusses the multiple disciplinary

persons involved in the decision to terminate Plaintiff's employment, were aware of her EEOC charge.   Defendant argues, however, that Plaintiff cannot establish a causal connection between the filing of her EEOC charge and her termination because there is a lack of temporal proximity between the filing of her EEOC charge in December 2008 and her termination in June 2009.  (See Doc. 43, Def. Br. at 17, 19).

The undersigned will assume, without deciding, that Plaintiff can make out a *prima facie* case of retaliation.  As discussed *infra*, however, she has failed to create a genuine issue of material fact on whether each of Defendant's articulated legitimate non-retaliatory reasons for terminating her is a pretext for retaliation.

### 3.   Defendant's Articulated Legitimate, Non-Retaliatory Reason For Employment Decision

"Once a plaintiff has established a prima facie case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action."   Pennington, 261 F.3d at 1266.   "As with a Title VII discrimination claim, the employer's burden is 'exceedingly light.' "   Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1495 (11th Cir. 1989)).

---

write-ups that culminated in her termination (see id. at 18-22).  It thus appears that the focus of Plaintiff's retaliation claim is her termination.  The undersigned will therefore address the write-ups in the analysis of whether Defendant's reasons for Plaintiff's termination are pretextual.

To the extent that Plaintiff has alleged any other acts of retaliation during this litigation, she has failed to address any allegedly retaliatory acts other than her disciplinary write-ups and her June 12, 2009 termination in her response to Defendant's motion for summary judgment, and therefore, she has abandoned any claim based on other alleged acts of retaliation.

Dunlap, the Regional Director at Sequoia Golf Holdings, LLC, testified that, after discussing Plaintiff's performance issues with Kriews, the General Manager at Traditions, Dunlap "decided to terminate [Plaintiff's] employment due to member complaints and problems working with other staff members." (Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶¶ 2, 8-9). Furthermore, both Plaintiff's Termination Notice signed by Kriews and her Department of Labor Separation Notice indicate that the reasons for her termination were "[c]ustomer complaints regarding poor service" and "[l]ack of teamwork with rest of the staff." (Def. Exs. 15 and 16 to Peppers Dep.).

The undersigned finds that Defendant has met its "exceedingly light" burden of articulating a legitimate, non-retaliatory reason for terminating Plaintiff.

**4.    Pretext**

Because Defendant has articulated a legitimate, non-retaliatory reason for terminating her, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision" in order to survive summary judgment. Chapman, 229 F.3d at 1024. Furthermore, Plaintiff must show both that Defendant's articulated reasons were false, and that the real reason was prohibited retaliation. See Brooks, 446 F.3d at 1163.

**a.    Disciplinary Write-Ups**

30

In an effort to create an issue of fact with respect to Defendant's reliance, in making the termination decision, on Plaintiff's performance history—particularly her series of disciplinary write-ups—Plaintiff asserts that prior to filing her EEOC charge, she "had <u>never</u> been disciplined for performance," but that soon after her rehire in March 2009, Defendant's retaliatory conduct began.  (Doc. 46, Pl. Br. at 19 (emphasis in original)).  Plaintiff lists the following allegedly retaliatory acts:  her April 1, 2009 Disciplinary Report (Def. Ex. 10 to Peppers Dep.); her April 10, 2009 Written Warning (Def. Ex. 11 to Peppers Dep.); her April 30, 2009 Record of Verbal Counseling (Def. Ex. 12 to Peppers Dep.); her May 13, 2009 Disciplinary Report (Def. Ex. 13 to Peppers Dep.); and her May 15, 2009 Written Warning (Def. Ex. 14 to Peppers Dep.).

The undersigned finds that the issuance of these disciplinary write-ups does not demonstrate that Defendant's reasons for terminating her were a pretext for retaliation.  In the first place, the write-ups issued on April 1, 2009, April 10, 2009, May 13, 2009 and May 15, 2009 were issued by Spicer and Amland, and there is no evidence that either of them was aware of Plaintiff's EEOC charge.  Therefore, Plaintiff has not presented evidence from which a reasonable jury could find,  even if the allegations set forth in those write-ups were untrue, that Spicer or Amland was motivated by a desire to retaliate against Plaintiff for filing an EEOC charge.

Second, although Kriews knew about Plaintiff's EEOC charge, approved the

write-ups, issued the April 30, 2009 Record of Verbal Counseling and reported Plaintiff's performance issues to Dunlap, Plaintiff has not presented evidence that Kriews did not believe that Plaintiff engaged in the misconduct reported to him by Spicer, Amland and/or customers at the club. Moreover, she has not presented evidence that Dunlap, who ultimately decided to terminate Plaintiff, did not believe that there had been customer complaints about Plaintiff's service or that Plaintiff had experienced difficulty getting along with other staff members (including her immediate supervisor, Spicer), as outlined in some of the disciplinary write-ups. Although Plaintiff asserts in conclusory fashion that "Defendant falsely accused Plaintiff of infractions" (Doc. 46, Pl. Br. at 21), she has not made any showing that Kriews or Dunlap did not believe she committed those "infractions," even if their beliefs were mistaken.[20] See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (with respect to the legitimate, nondiscriminatory reason offered by the defendants for firing the plaintiff, the pretext "inquiry . . . is limited to whether [those who investigated the charges of sexual harassment against the plaintiff and made the decision to fire him] *believed* that Elrod was guilty of harassment, and if so, whether this belief was the reason behind Elrod's discharge" (emphasis in original)). In Boyce v. Belden, No. 3:99-CV-126 (DF), 2002 U.S. Dist. LEXIS 1550, at *27 (M.D. Ga. Jan. 30, 2002), the court explained the pretext inquiry this way:

---

[20] Furthermore, as discussed *supra*, to the extent Plaintiff believes the write-ups were unfair because her misconduct was, in her own mind, minimal or excused by circumstances such as not having enough help, her belief is not evidence of pretext.

The issue before the Court at this stage is not whether Defendant Walton County was correct in its determination of Plaintiff's performance; rather, the Court must examine whether Defendant Walton County made its employment decision because of these perceptions of her performances, regardless of whether these perceptions were actually correct.

The write-ups issued on April 1, 2009, April 30, 2009 and May 13, 2009 (Def. Exs. 10, 12, 13 to Peppers Dep.) show that Plaintiff was counseled about her interactions with other staff and customer service issues; thus the write-ups support Dunlap's decision "to terminate her employment due to member complaints and problems working with other staff members." (Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶ 9).[21]   Although Plaintiff might not agree with the characterization of her conduct in each of these write-ups, she admits, with respect to the April 1, 2009 write-up, that she "was cutting up some lemons or something, and [Spicer] yelled at [her], and [Plaintiff] said, If you're going to be yelling at me, you do it yourself." (Peppers Dep. at 63).  With respect to the April 30, 2009 Record of Verbal Counseling, she admits that she "[does not] know" whether or not the member complained of poor service by her (Def. SMF, ¶ 49); she also admits that she "was on [her] phone with [her] son," and her "voice kind of carried " and that she has no "reason to dispute that a member complained" about her being loud.  (Peppers Dep. at 73).  With respect to the May 13, 2009

---

[21] Plaintiff also received write-ups for undercharging a customer for wine (Def. Ex. 11 to Peppers Dep.) and for coming to work late (Def. Ex. 14 to Peppers Dep.).  Although Dunlap might have considered this misconduct as part of Plaintiff's "recurring performance issues," he testified that he "decided to terminate her employment due to member complaints and problems working with other staff members" (Dunlap Decl., ¶ 9).  Therefore, the undersigned considers only those write-ups that concern such issues to be relevant at this stage.

incident, she admits that she was involved in a disagreement with Spicer and was sent home.  (Peppers Dep. at 79-80).

Finally, Plaintiff has not controverted the fact that a customer complained about her service on June 12, 2009, and she has not presented evidence that Kriews did not report members' complaints and Plaintiff's performance history to Dunlap.  While she seeks to excuse the quality of her service by the fact that she was the only server and alleges that the customer told her it was not her fault,[22] she has not controverted the fact that a customer complained about her or that the complaint was reported to Dunlap.  Again, she must do more than point out the unfairness of her employer's actions to demonstrate pretext.

Furthermore, and critically, Plaintiff has not controverted **both** reasons cited by Dunlap for her termination: "member complaints" and "problems working with other staff members."  (Dunlap Decl., Def. Ex. 1 to Doc. 43, ¶ 9). See Chapman, 229 F. 3d at 1037 ("In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that **each**

---

[22] Plaintiff also asserts that "the customer complaint for which [she] was fired was actually against Kriews, *not* Plaintiff" (Doc. 46, Pl. Br. at 21 (emphasis in original)), but she does not cite to record support for that assertion.  Plaintiff testified that Kriews explained to her when he informed her of her termination that "a golf member was complaining about me, that I had poor service," and Plaintiff responded, "Okay, but Kev[i]n I had 20 to 25 golfers to feed by myself.  I had to serve the alcohol, food, beverage, and the drinks, and I had no help, and they offered me no help." (Peppers Dep. at 95-96).  Plaintiff also testified that the customer who complained about her had said to her "Ma'am, I am so sorry.  You are in here by yourself.  You need some help . . . . It's not your fault," and he gave her $5.00.  (Id. at 96).  That testimony does not show that the customer did not complain about Plaintiff's service.  The undersigned also notes that in her September 9, 2009 filing [Doc. 10], Plaintiff wrote, "The day of the customer's complaint . . . I was overwhelmed with orders [and] one of the golfers got upset with me" but later apologized.  That account does not show that a golfer did not complain about her service.

of the employer's proffered nondiscriminatory reasons is pretextual." (emphasis added)).  Plaintiff has not presented evidence that Dunlap (and Kriews, to the extent he was involved in the decision to terminate Plaintiff) did not believe there had been member complaints about her, **and** she has not presented evidence that Dunlap (and Kriews) did not believe she had problems working with other staff members, including her supervisor, Tara Spicer.

### b.   <u>Disparate Discipline</u>

Plaintiff also argues that "this Court should weigh Defendant's response [to] other workplace misconduct against its discipline of Plaintiff, in order to assess Defendant's credibility."   (Doc. 46, Pl. Br. at 21).   She cites evidence that "Campbell became intoxicated during her shift while drinking alcohol at the golf course bar," but she was only "scolded" and sent home to sober up, and "was not terminated or written-up." (<u>Id.</u>).[23]  Plaintiff argues that "[t]he logical inference here is that Defendant selectively disciplined Plaintiff more harshly than Campbell [b]ut unlike Campbell, Plaintiff had filed a Charge of Discrimination."  (<u>Id.</u> at 22).

The undersigned finds that Campbell's single instance of misconduct is not sufficiently similar to Plaintiff's repeated disciplinary actions such that a

---

[23] Plaintiff asserts that the Employee Handbook treats being under the influence of alcohol at work as a "Critical offense[]," a "serious violation[] of work rules or employee misconduct that justif[ies] immediate discharge or serious disciplinary consequences without regard to the employee's length o[f] service or prior conduct."  (Doc. 46, Pl. Br. at 21-22; <u>see also</u> Pl. Exs. 16A &16B, Attach. 2 to Doc. 46).  However, the Employee Handbook does not provide that the employer is **required** to terminate someone for "Critical Offenses" (<u>see</u> Pl. Ex. 16A, Attach. 2 to Doc. 46). Moreover, the undersigned notes that "Insubordinate acts or statements," which is one of the allegations against Plaintiff in some of her write-ups, is also a "Critical Offense" (Pl. Ex. 16B, Attach. 2 to Doc. 46).

comparison of their treatment demonstrates pretext.  See McCann v. Tillman, 526 F.3d 1370, 1373 (11th Cir.) ("In order to determine whether other employees were similarly situated to McCann, we evaluate whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. In doing so, the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." (internal quotations and citations omitted)), cert. denied, 129 S. Ct. 404 (2008); Morris v. Emory Clinic, 402 F.3d 1076, 1082 (11th Cir. 2005) ("Without showing that a comparable female received 'nearly identical' complaints, we cannot adequately compare the Clinic's actions towards Morris and other female physicians.").  Dunlap made clear that in deciding to terminate Plaintiff, he considered Plaintiff's performance record, which included multiple complaints by club members as well as multiple reports of discord between her and Spicer.  That record of complaints and reports stands in contrast to Campbell's one incident of intoxication.[24]  Defendant's treatment of Campbell is not evidence that Dunlap's reasons for terminating Plaintiff were a pretext for retaliation.

---

[24] The undersigned notes that Campbell was fired by Traditions for not coming to work, prior to the time Plaintiff was terminated.  (See Def. SMF, ¶ 77).  In response to Def. SMF ¶ 77, Plaintiff disputes that Campbell was fired, based on Campbell's statement in her declaration at paragraph 8 that "in May 2009, I just never went back.  I abandoned my job with Traditions, but Traditions wrote it up as though they fired me for being a no-call, no-show.  But actually, I had quit." (Campbell Decl., Attach. 3 to Doc. 46, ¶ 8).  Campbell's testimony does not controvert the fact that Defendant terminated Campbell for not coming to work, regardless of Campbell's subjective intention not to return to work after she "abandoned" her job.  Furthermore, in her deposition, Plaintiff testified that Campbell "ended up getting fired[.]" (Peppers Dep. at 88).

The undersigned finds that Plaintiff has failed to point to evidence that creates an issue of fact on whether **each** of Defendant's reasons for terminating Plaintiff, i.e., "member complaints" and "problems working with other staff members," was pretextual.  Nor has she pointed to evidence that the real reason for her termination was retaliation.  Accordingly, it is **RECOMMENDED** that Defendant's motion for summary judgment be **GRANTED** on Plaintiff's Title VII retaliation claim.

## VI.  Conclusion

It is **ORDERED** that Plaintiff's Motion for Leave to File Sur-Rebuttal Response to Defendant's Reply Brief in Support of its Motion for Summary Judgment [Doc. 51] is **GRANTED**.

It is **RECOMMENDED** that Defendant's Motion for Summary Judgment [Doc. 43] be **GRANTED** and Plaintiff's claims be **DISMISSED**.

The Clerk is **DIRECTED** to terminate referral of this matter to the undersigned magistrate judge.

**IT IS SO ORDERED, REPORTED AND RECOMMENDED** this 27th day of January, 2011.

*Susan S. Cole*
Susan S. Cole
United States Magistrate Judge